# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | | |
|---|---|---|
| ANGELA HEIGHT, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CV 212-077 |
| | * | |
| GEORGIA DEPARTMENT OF | * | |
| HUMAN SERVICES, | * | |
| | * | |
| Defendant. | * | |

## ORDER

Presently before the Court is Defendant's Motion for Summary Judgment. Dkt. No. 31. For the reasons stated below, Defendant's Motion is **GRANTED** in part and **DENIED** in part.

### FACTUAL BACKGROUND

This is a Title VII case in which Plaintiff contends she was demoted based on her race, African American. She claims further that she was retaliated against for filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). See Dkt. Nos. 11, 28. Plaintiff alleges violations of 42 U.S.C. §§ 2000(e), 1981, 1983, and 1985, and the Thirteenth and Fourteenth Amendments, as well as claims for hostile work environment and intentional infliction of emotional distress.

1

AO 72A
(Rev. 8/82)

Plaintiff Angela Height was hired by the Glynn County Department of Family and Child Services ("DFCS") in 1994. Dkt. No. 31, Ex. 1, ¶ 1; Dkt. No. 44, ¶ 1. Plaintiff was promoted to the position of Error Control Specialist in April 2007 and to the position of Office of Family Independence ("OFI") supervisor in September 2009. Id. at ¶¶ 2-3.

As OFI Supervisor, Plaintiff managed and supervised front desk and clerical operations. Dkt. No. 31, Ex. 10, 19: 10-15. The front desk staff was responsible for processing and distributing applications for food stamps. Id. at 20: 12-19. Prior to Plaintiff assuming those duties, Jamie Rhodes ("Rhodes"), a Caucasian employee, supervised that area (Id. at 21: 15-17), but took family medical leave around Thanksgiving of 2009 and did not return until January 2010. Dkt. No. 31, Ex. 39, 10: 10-13. Plaintiff and her fellow supervisor, Harold Small, absorbed Rhodes's duties while she was away on leave. Dkt. No. 31, Ex. 10, 21: 22-24.

**DFCS Audit**

The Glynn County DFCS Office had, prior to Plaintiff's promotion, experienced difficulties processing applications in a timely manner. Dkt. No. 31, Ex. 34, 25: 17-20. The Georgia Department of Human Services used a metric called Standard of Promptness ("SOP") to determine the percentage of applications

2

that were timely processed. Dkt. No. 31, Ex. 1, ¶ 29; Dkt. No. 44, ¶ 29.

On January 5, 2010, Freddie Norris, a Caucasian employee who was the Region XII Food Stamp Field Specialist, conducted an audit of the Glynn County DFCS Office. Dkt. No. 31, Ex. 38, 18: 18-24. The audit was prompted by SOP problems. Id. at 19: 7-17. Norris specifically looked at the processing, timeliness, and accuracy of food stamp applications. Id. During the audit, Norris spoke with two employees, Arlie Slay ("Slay") and Tonya Tresvant ("Tresvant"), although Norris did not speak with Plaintiff's immediate supervisor, Semona Holmes ("Holmes"), regarding Plaintiff's work performance. Dkt. No. 31, Ex. 32, 21: 4-15. In fact, Harold Small ("Small"), Plaintiff's fellow supervisor, testified that he was not interviewed prior to the audit report being made, and was never asked about Plaintiff's performance or ability to work as a supervisor. Dkt. No. 49, 14: 12-23.

Plaintiff contends that the audit results were inaccurate because Norris based much of the report on the words of Slay and Tresvant, who Plaintiff believes to have personal problems with Plaintiff and her family. Dkt. No. 31, Ex. 10, 40: 2-9, Dkt. No. 43, Ex. 1, ¶¶ 13-14. Slay and Tresvant informed Norris that Height had instructed them to deny applications early. Dkt. No.

3

31, Ex. 38, 20: 15-23. DFCS policy instructs employees to schedule interviews and to interview applicants prior to denying applications, unless applicants miss their appointment and make no contact with the agency. Dkt. No. 44, ¶¶ 21-22; Dkt. No. 31, Ex. 1, ¶¶ 21-22. Plaintiff adamantly denies that she ever instructed anyone to improperly close cases early. Dkt. No. 43, Ex. 1, ¶ 12. Plaintiff further contends that every customer referenced in Norris's report was serviced by Slay and that Slay's actions caused the problems noted in the report. Id. at ¶¶ 10, 11.[1]

Slay also informed Norris that she had been told to deny applications without making contact with clients or sending the appointment letters they were supposed to receive. Dkt. No. 47, 23: 10-15. Norris contacted several of those clients who denied ever receiving an appointment letter, although appointment letters appeared in the files. Id. at 22: 10-25, 23: 1-25, 38: 6-20. Norris was concerned that the appointment letters contained in the records were fraudulent. Id. at 41: 9-19. Slay also sent Norris emails regarding Plaintiff's allegedly improper instructions in which she repeated her contention that Plaintiff told Slay to close cases early. Dkt. No. 31, Ex. 5, Ex. C.

---

[1] Jacki Bryant, Region XII OFI Regional Manager, testified that Slay was not disciplined after the audit report because she resigned on January 26, 2010. Tresvant received a Memorandum of Concern and Expectations on January 27, 2010. Dkt. No. 31, Ex. 5. ¶ 10.

4

Norris testified that a front desk employee told her the front desk workers "were being told by Ms. Height to give information out the front window as far as not doing--they weren't going to give them an appointment letter right then; that they'd be calling them back with an appointment letter." Dkt. No. 47, 24: 19-25. According to Holmes, it was surprising that Slay was involved in Norris's investigation because Slay "complained about everything," yet had sent Holmes an email "outlining the improvements that had taken place since Mrs. Height had become supervisor and just commending [her] on putting her in that position . . . ." Dkt. No. 31, Ex. 32, 49: 2-12.

**Audit Report**

On January 7, 2010, Norris issued a memorandum ("the Report") to Jacki Bryant documenting her concerns following the audit. Dkt. No. 31, Ex. 13. In the Report, Norris stated she:

> was told that workers were being told by supervision to close cases before the 30th day so that they would not reflect on the OSOP [Over Standard of Promptness] report as well as cases that were issued a Form 173 requesting verification with a due date, and workers were told to close before the end of the month even though it was before the due date. If these cases are pulled by QA or QC they will be Invalid/denials.

Id. The Report also outlined concerns that clients were being asked about personal information through the front window, in violation of policy, and listed various clients with whom no

5

contact was made and who did not receive an appointment letter. Id. Because the Report referred mainly to improper instructions from "supervision," Plaintiff argues that the two other supervisors, Rhodes and Small, were equally implicated by the Report. See Dkt. No. 43, pg. 4. Plaintiff argues that the Report implicated all three supervisors, because all three supervisors had authority over the intake workers. See id. (citing Dkt. No. 46, 27: 23-24; Dkt. No. 31, Ex. 10, 22-23.).

**Plaintiff's Demotion**

The Report was emailed to Lisa Lariscy ("Lariscy"), Regional Director of Region XII. Lariscy testified that she deferred to Norris's findings because she had "no reason to believe that Ms. Norris in her report, in her investigation -- if you want to call it that -- was not absolutely accurate." Dkt. No. 31, Ex. 34, 18: 22-25.

Lariscy demoted Plaintiff and testified that the reason was "her performance as a supervisor specifically as it related to the lack of a process for accepting applications and telling staff to inappropriately process applications." Id. at 28: 20-25. Plaintiff affied that, contrary to Lariscy's assertion, Plaintiff did have a process in place for accepting economic support applications. Dkt. No. 43, Ex. 1, ¶ 15. Furthermore, Plaintiff submitted a copy of the checklist that she created and

6

which she contends shows the process she instituted for taking applications. See Dkt. No. 43, Ex. 1, Ex. 2.

Lariscy held a staff meeting on January 11, 2010, which included Plaintiff, Norris, Holmes, Bryant, and Small. Dkt. No. 31, Ex. 10, 42: 3-22. Plaintiff stated that during the meeting, Lariscy "accused [her] of fraud, said that [Plaintiff] had falsified documents, and that it was indicated in the report from Mrs. Norris." Id. at 43: 9-11. Plaintiff contends that she was not allowed to speak in her defense at this meeting, but was told to "be quiet and shut up." Id. at 50: 9-10. Plaintiff and the other employees were informed that Plaintiff "was no longer going to be supervising." Id. Plaintiff's demotion was later processed by the human resources department, with the letter sent by human resources stating, "[t]his demotion is based on your continuing performance deficiencies and your failure to meet the standard of performance for an OFI Supervisor." Dkt. No. 43, Ex. 3. Holmes testified that staff members were "very emotional" and were even crying following the announcement of Plaintiff's demotion. Dkt. No. 31, Ex. 32, 45: 22-25.

Holmes did not agree that Plaintiff should be demoted based on the Report and Norris's investigation. Id. at 24: 1-25 – 28: 1-10. Holmes felt that Plaintiff was an "exceptional" employee who was "knowledgeable," "committed," and a "great team player."

7

Id. at 12: 15-17. Holmes testified that she did not attribute SOP issues to Plaintiff. Rather, she stated, "there were problems with the SOP and I knew that the agency was working hard to try to bring the number down . . . . I identified it as an agency problem . . . . I didn't identify the problem just associated with [Plaintiff]." Id. at 11: 1-10.

Holmes also did not believe that Plaintiff falsified documents or violated any federal food stamp policy and wanted further proof beyond the Report that Plaintiff had taken those actions. Id. at 25: 13-19. Holmes testified she believed Plaintiff was demoted because of "bad leadership" and "someone abusing their power" but that she disagreed with the demotion because she "never believed that [she] had enough evidence to substantiate that [Plaintiff] [] actually did this." Id. at 25: 21-24, 27: 11-14. Holmes also commented on the unusual nature of Plaintiff's demotion. She stated:

> Usually when this kind of decision is made, it's made after long deliberation, after looking at a person's work history with the agency, after talking with the involved parties, after reviewing data that can show where the -- you know, where the evidence is that this could have happened or the probability of it happening [] is very great. Then those decisions are made. Not like this -- this happened.

Id. at 37: 22-25, 38: 1-5. Furthermore, Holmes testified that had she been given evidence to show the conclusions in

8

the report to be true, she would have recommended for Plaintiff to be fired rather than demoted. Id. at 70: 24-25, 71: 1-7.

No other supervisor was demoted as a result of the investigation, including Small or Rhodes. Dkt. No. 31, Ex. 34, 33: 3-15. Rhodes later returned from family medical leave and requested a voluntary demotion.[2] Id. Lariscy testified that Rhodes was not disciplined as a result of Norris's investigation "because the problems that were noted in the report were specific to the staff that [Plaintiff] directly supervised and to the process of processing intake applications at the front desk which [Plaintiff] was over." Id. at 78: 25, 79: 1-4. Holmes testified that although Rhodes wanted to step down, Lariscy talked with Rhodes to encourage her not to do so. Dkt. No. 31, Ex. 32, 34: 1-9. Holmes stated that she did not understand "why Ms. Lariscy intervened with the demotion of Mrs. Rhodes, because [Mrs. Rhodes] was the one that requested it. And Ms. Lariscy was aware of the issues that [Mrs. Rhodes] was presenting as a manager." Id. at 33: 22-25, 34: 1.

---

[2] Rhodes testified that she requested the demotion because her personal problems meant that she "would not have the time needed to commit to that position." Dkt. No. 31, Ex. 39, 21: 1-6.

9

**First EEOC Charge: Discrimination**

Plaintiff filed a Charge of Discrimination with the EEOC on February 8, 2010 alleging that she was demoted based on her race. The Charge specifically notes:

> On January 11, 2010, Lisa Lariscy, Regional Director, demoted me to Screener, based on the report submitted by Freddie Norris. Jamie Rhodes, OFI Supervisor's (white, female), work product was included in the same report, however, Ms. Rhodes did not receive any disciplinary actions for the noted procedure discrepancy.

Dkt. No. 43, Ex. 4.

**Second EEOC Charge: Retaliation**

On November 1, 2011, Plaintiff filed a second Charge of Discrimination with the EEOC. In this Charge, Plaintiff alleges that she was discriminated against for filing her initial, February 8, 2010 Charge. She specifically stated:

> Since March 4, 2010, I have been continuously harassed and subjected to different terms in conditions of employment. I have been continuously demoted to lesser responsibilities by Regional Manager, Jackie Bryant and not allowed to perform the essential functions of my position. I have been moved around the office on numerous occasions to different offices and externally to another location. My most recent move was in July 2011. On July 31, 2011, I received an uncharacteristically low annual performance review.

Dkt. No. 43, Ex. 4.

10

AO 72A
(Rev. 8/82)

## Multiple Moves and Changes in Duties

After her demotion, Plaintiff was assigned to work under Small's supervision in the review unit as an interviewer. Dkt. No. 31, Ex. 5, pg. 4. In October 2010, because Plaintiff lived in McIntosh County, she agreed to move to the McIntosh office, where she was assigned to process applications and conduct reviews on food stamp cases. Id. Plaintiff testified that she did not mind working in McIntosh County because it was nearby to her home and required less gas money to get to and from work. Dkt. No. 31, Ex. 12, 66: 9-14. In March 2011, after two workers resigned from the McIntosh County office, leaving Plaintiff as the only case manager in this county, she worked two days in Glynn County and three days in McIntosh County each week. Dkt. No. 31, Ex. 5, pg. 4. In April 2011, Bryant moved all of the work from the McIntosh County office work to Glynn and Camden County offices, meaning that it was no longer necessary to house a worker in McIntosh County. Id. Thus, Plaintiff was moved back to Glynn County where she worked as an interviewer. Id. In June 2011, Bryant met with all of the supervisors in the Glynn County OFI to determine the most productive placements for staff members, resulting in ten case managers being reassigned to complete different duties based on the supervisors' input regarding worker strengths. Id. As a result of this

11

reassignment, Plaintiff began working as a processor under Betty Francis in the Intake Unit. Id. Plaintiff requested to be moved from Francis's supervision because Plaintiff suspected that Francis might have been involved in the investigation that led to her demotion. Dkt. No. 31, Ex. 10, 73: 10-19. Bryant moved Plaintiff to Lisa Bessent's supervision because Bryant believed that Plaintiff, as a veteran worker, could effectively function as a specialized Medicaid worker, which would help improve the SOP. Dkt. No. 31, Ex. 5, pg. 4-5. Plaintiff was relocated to Bessent's hall to be nearby Bessent for assistance. Id. at pg. 5.

Plaintiff is currently the only employee under Bessent's direct supervision. See Dkt. No. 43, Ex. 1, Ex. 1. All other employees in the Tri-Coastal Service Center share a supervisor with several other employees. Id. Having only one employee under a supervisor is unusual; neither Small nor Lariscy could identify another instance of this organizational structure. Dkt. No. 46, 41: 7-9; Dkt. No. 49, 26: 10-15.

Several other case managers within Region XII were also reassigned multiple times. Susan Carter, who is Caucasian, was moved six times starting in July 2010 and had three different offices; Vernal Morrison, who is African American, was moved four times; Tonalisa LaVant, who is African American, was moved

12

six times starting in July 2010 and had three different offices; and Lautrese Thomas, who is African American, was moved five times in 2011 and had three different offices.  Dkt. No. 31, Ex. 5, pg. 5.  Defendant claims the reassignments resulted from business restructuring to help address the increase in families needing assistance.  Id. at pg. 2.

Changes to September 2011 Performance Evaluation

Small first drafted a performance evaluation for Plaintiff on September 23, 2011.  Through four subsequent revisions, Small was instructed by Bryant, his supervisor, to change the evaluation to include critical comments and lower Plaintiff's ratings.  See Dkt. No. 43, Ex. 5.  Small had never previously been instructed to make such substantial edits to a performance evaluation he drafted.  Dkt. No. 49, 32: 4-7.  Small testified that he believed his original draft was correct.  Id. at 31: 5-7.  Several ratings were changed from a "3" to a "2."  Dkt. No. 31, Ex. 1 ¶¶ 54, 57, 58, 59; Dkt. No. 44, ¶¶ 54, 57, 58, 59.  A rating of "3" is given to an employee who has met every performance expectation and may have exceeded some, and who performed as a "solid contributor to the success of his/her department and the State."  Dkt. No. 31, Ex. 1, ¶ 55, Dkt. No. 44, ¶ 55.  A rating of "2" is given to an employee who has met most but not all performance expectations, and who needs

13

improvement in at least one area. Id. at ¶ 56. Bryant identified overdue and untimely claims as well as complaints she received regarding Plaintiff as the reasons why she recommended changing the performance evaluation ratings. Dkt. No. 31, Ex. 5, pg. 6. Even with the changes, Plaintiff's overall performance evaluation was that of a successful performer, with an overall rating of "3," and an actual rating of "2.85." Dkt. No. 31, Ex. 23.

## Promotional Opportunities

Plaintiff argues that Defendant retaliated against her by not informing her of promotional opportunities that were filled by other employees. Specifically, Lautrese Thomas was selected as lead worker, a position selected by the supervisor of the unit in 2010. Dkt. No. 31, Ex. 5, pgs. 8-9. Rhodes was selected as lead worker in 2012. Id. at pg. 9. Additionally, Bryant asked the supervisors within OFI to speak with staff they thought would be well suited for management when an acting supervisor position opened in Glynn County. Id. at pg. 8. Lautrese Thomas, Myra Alvin, and Vanessia Wallace applied for the position as a result. Id.

## Disheveled Office

Plaintiff contends that her office was "trashed" while she was out on family medical leave. She testified that it did not

14

look trashed when she left for leave. Dkt. No. 31, Ex. 10, 112: 6-8. Plaintiff stated, "[a]fter filing my EEOC Charge, I returned to my office destroyed and in shambles." Dkt. No. 43, Ex. 1, ¶ 17. Plaintiff submitted a photograph of her office, which reveals some trash on the floor and some clutter on her desk. Dkt. No. 43, Ex. G.

Christmas Lunches

Plaintiff contends that Defendant's retaliation is also indicated by Plaintiff not being invited to attend a unit specific Christmas luncheon. Dkt. No. 43, Ex. 1, ¶ 6. Traditionally, each unit would eat lunch together prior to the Christmas holidays followed by the supervisor allowing employees to go home for four hours to prepare for the holiday. Dkt. No. 31, Ex. 10, 93: 1-9. During December 2012, multiple supervisors organized Christmas lunches for their employees and allowed their employees to leave early that day. Id. at 93: 14-15. At three o'clock on December 12, 2012, Bessent, who only supervised Plaintiff, invited Plaintiff to go to lunch and to take the rest of the afternoon off work. Id. at 5-17. Bessent told Plaintiff that "she forgot about [Plaintiff]." Id. at 94: 14-17. Plaintiff did not go to lunch with Bessent and, because she had not prepared to leave early that day, Plaintiff did not leave early. Id. at 94: 1-12.

15

## LEGAL STANDARD

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could impact the outcome in a case. <u>Anderson v. Liberty Lobby, Inc.</u> 477 U.S. 242, 248 (1986). A dispute is genuine only where the jury could issue a verdict in the nonmoving party's favor. <u>Id.</u> In determining whether summary judgment is appropriate, the Court will view the evidence "in the light most favorable to the opposing party." <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

The moving party bears the burden of showing a lack of genuine issue of material fact. <u>Adickes</u>, 389 U.S. at 157. The moving party should do so by identifying "particular parts of materials in the record" which indicate "the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A). It is only after the moving party has fulfilled this burden that the party opposing summary judgment bears a burden of responding. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The nonmovant will defeat a motion for summary judgment by presenting evidence "such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

16

**DISCUSSION**

I.   Title VII Racial Discrimination

Title VII prohibits employment discrimination on the basis of color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), the plaintiff in a Title VII case bears the initial burden of establishing a prima facie case of race discrimination. Demonstrating a prima facie case only requires the plaintiff to put forth facts that create an inference of discrimination. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

To establish a prima facie case of discrimination, the plaintiff must prove that he or she: 1) belonged to a racial minority; 2) was subjected to adverse job action; 3)was treated less favorably than similarly situated, non-minority employees; and 4) was qualified for the job. Holifield, 115 F.3d at 1562; Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). A plaintiff is subjected to an adverse employment action when he suffers "a serious and material change in the terms, conditions, or privileges of employment." Rainey v. Holder, 412 Fed.Appx. 235, 238 (11th Cir. 2011)(quoting Davis v. Town of Lake Park, 245 F.3d 1232, 1238-39 (11th Cir. 2001)). "To make a comparison of the plaintiff's treatment to that of non-minority employees,

17

the plaintiff must show that he and the employees are similarly situated in all relevant respects." Holifield, 115 F.3d 1555 at 1562. Determining whether employees are similarly situated requires the Court to look at whether they "are involved in or accused of the same or similar conduct and are disciplined in different ways." Brown v. Jacobs Engineering, Inc., 401 Fed. Appx. 478, 480 (11th Cir. 2010) (quoting Maniccia, 171 F.3d at 1368. "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." Holifield, 115 F.3d at 1562. After establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas Corp., 411 U.S. at 802. The plaintiff then bears the burden of producing sufficient evidence of pretext. Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 248 (1981).

Prior to bringing a Title VII discrimination suit, a plaintiff must exhaust administrative remedies, which include filing a timely charge of discrimination with the EEOC.

Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1316 (11th Cir. 2001). The Court may only analyze a Title VII claim based on the scope of the EEOC charge. See Thomas v. Miami Dade Public Health Trust, 369 Fed.Appx. 19, 22 (11th Cir. 2010)(affirming the district court's determination that race and sex discrimination claims were barred where EEOC Charge alleged only retaliation, but complaint alleged race and sex discrimination).

**Prima Facie Case**

It is undisputed that Plaintiff, as an African American female, belonged to a racial minority, that she was subjected to an adverse job action through demotion, and that she was qualified for the job. Rather, the dispute regarding the prima facie case centers on whether Rhodes was an employee similarly situated to Plaintiff. Plaintiff contends that Rhodes was similarly situated to Plaintiff yet avoided punishment, specifically demotion, following the audit report. Dkt. No. 11, ¶¶ 17, 19. Defendant contends that Plaintiff and Rhodes were not similarly situated because, unlike Plaintiff, Rhodes was not accused of acts such as denying applications early and failing to send appointment letters. Dkt. No. 31, Ex. 2, pg. 8.

Without the audit, Plaintiff and Rhodes were similarly situated, as both were OFI supervisors in the same office. Deposition testimony indicates that both supervisors were faced

19

with the SOP challenges, and that Rhodes was considered to have performance deficiencies. Dkt. No. 31, Ex. 32, 13: 15-16, 18. The distinguishing factor between Plaintiff and Rhodes is that Plaintiff received accusations in the audit that Rhodes did not. If the audit itself was generated in a racially discriminatory fashion, though, the presence of accusations against the African American employee and not against the Caucasian employee cannot logically serve as the sole distinguishing factor that makes the employees not similarly situated. The Court finds that Plaintiff has brought forth sufficient evidence to create a fact issue as to whether Rhodes and Plaintiff are similarly situated.

Much of the basis for the negative audit report stems from allegations by Slay and Tresvant that Plaintiff instructed them to close cases early and not send appointment letters. Plaintiff adamantly denies that she engaged in the behavior noted in the Report. Holmes testified that she did not believe the allegations in the Report, and that no other evidence was provided to support the allegations. Further, Plaintiff contends that the Report itself was generated in a discriminatory fashion. Evidence to support this contention is that Plaintiff's African American immediate supervisor and also her African American fellow supervisor, who could best attest to Plaintiff's performance, were not consulted. Dkt. No. 43, Ex. 1, ¶¶ 11-12.

20

Also, Plaintiff contends she was not given an opportunity to dispute the Report at the meeting held by Lariscy and that the Report was used as the sole basis for Plaintiff's demotion, which was an unprecedented method for deciding upon an employee demotion. In contrast, Rhodes, a Caucasian employee, retained her position even after performance deficiencies and even after requesting that she be demoted. Consequently, a factual dispute exists regarding whether the Report was generated out of racial animus, which in turn goes to whether Plaintiff and Rhodes were similarly situated.

The Court finds that summary judgment is not appropriate because a dispute over a genuine issue of material fact exists with regard to whether Plaintiff was treated less favorably than a similarly situated, non-minority employee. Specifically in dispute is whether the audit report that formed the basis for Plaintiff's demotion but not Rhodes's demotion was generated out of racial animus, thereby serving as an invalid justification for Plaintiff's demotion. Resolution of this factual dispute will answer whether Plaintiff and Rhodes were similarly situated, and therefore whether Plaintiff established her prima facie case. Because this question of fact exists, summary judgment is not appropriate, but rather a jury must resolve the factual dispute.

21

**Legitimate, nondiscriminatory reason or pretext?**

Issues of material fact also exist with regard to Defendant's proffered reason for demoting Plaintiff. After a plaintiff establishes a Title VII prima facie case, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action. McDonnell Douglas Corp., 411 U.S. at 802. The burden then returns to the plaintiff to prove that the employer's reasons are a pretext for discrimination. Tex. Dept. of Cmty. Affairs, 450 U.S. at 248. A plaintiff shows pretext by providing enough evidence to "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Cooper-Houston v. S. Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994)). If the proffered reason could motivate a reasonable employer, "an employee must meet that reason head on and rebut it" by doing more than "simply quarreling with the wisdom of that reason." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000). It is not the Court's role to "sit as a super-personnel department that

AO 72A
(Rev. 8/82)

reexamines an entity's business decisions." Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

Plaintiff was demoted based on the results of Norris's audit report. As noted above, Lariscy testified that Plaintiff was demoted based on "her performance as a supervisor specifically as it related to the lack of a process for accepting applications and telling staff to inappropriately process applications." The demotion letter sent to Plaintiff specifies that Plaintiff's demotion occurred because of "continuing performance deficiencies and [her] failure to meet the standards of performance for an OFI supervisor."

Plaintiff asserts that Defendant changed the stated reasons for demoting Plaintiff by initially asserting that the demotion stemmed from allegations contained within the Report and next from "performance deficiencies." The Court does not find that these explanations are mutually exclusive, but rather that "performance deficiencies" is a more general term that could subsume the initially proffered reasons. Regardless, Plaintiff has presented evidence to cast sufficient doubt that the proffered reasons were actually what motivated Plaintiff's demotion. First, Plaintiff has presented evidence that a Caucasian OFI Supervisor with noted performance deficiencies was not demoted, which casts doubt on the notion that performance

deficiencies motivated the demotion. Second, Plaintiff testified under oath that she did not tell staff to inappropriately process applications, which casts doubt on the notion that the Report was conducted in an accurate, unbiased manner. Third, Plaintiff provided evidence to show the existence of her process for accepting applications. If believed, such evidence would cast doubt on the assertion that Plaintiff's lack of process was a legitimate reason for her demotion. Fourth, Plaintiff has presented evidence that her own supervisor did not find her performance deficient and did not believe the allegations against her, casting doubt on the contention that the Report was accurately generated and that performance deficiencies were the real reason for firing Plaintiff. Plaintiff has presented evidence from which a reasonable juror could determine that the proffered reasons for demoting Plaintiff were pretexts. Consequently, whether the proffered reasons for demoting Plaintiff were pretexts is in dispute and summary judgment is not appropriate.

## II. Title VII Retaliation

Plaintiff asserts a retaliation claim under Title VII. "Title VII protects employees against retaliation by an employer for participation in an employment discrimination case." Donnellon v. Fruehauf Corp., 794 F.2d 598, 600 (11th Cir. 1986). To

24

AO 72A
(Rev. 8/82)

establish a Title VII retaliation claim, Plaintiff must prove she: a) engaged in statutorily protected activity; b) suffered a materially adverse action; and c) there was a causal relation between the protected activity and adverse action. Butler v. Alabama Dept. of Transp., 536 F.3d 1209, 1212-13 (11th Cir. 2008)(quoting Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008)). After the plaintiff establishes a prima facie case, the employer may present a legitimate, non-retaliatory reason for the action. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001)(citing Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). However, "[t]he ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." Id.

"An action is materially adverse if it 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1259 (11th Cir. 2012)(citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Regarding causation, the United States Supreme Court determined that but-for causation is required in Title VII retaliation claims. Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013).

25

"The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Id. at 2534. The causation burden can be met by showing "close temporal proximity between the statutorily protected activity and the adverse employment action." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)(noting that "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint fails as a matter of law"). However, "mere temporal proximity, without more, must be 'very close.'" Id.

Plaintiff alleges that Defendant retaliated against her, indicated by her multiple moves and changes in duties, changes to her September 2011 performance evaluation, the denial of promotional opportunities, the items of trash in her office, and the alleged denial of a Christmas lunch. It is undisputed that Plaintiff has satisfied the first element of a retaliation claim by filing an EEOC Charge of Discrimination. Less clear is whether the changes she complains about are "materially adverse." An even more challenging element for Plaintiff to meet is that of causation.

26

## Multiple Moves and Changes in Duties

Plaintiff has not presented evidence that her various moves and duty changes would not have occurred but for wrongful actions of the employer. Rather, multiple other employees were moved to different offices without evidence that they filed EEOC Charges. Additionally, many other employees, like Plaintiff, changed job responsibilities numerous times. Plaintiff has not shown that her own reassignments were different from those of other employees and resulted from retaliation rather than the purpose stated by Defendant—business restructuring to help address the increase in families needing assistance.

Plaintiff alleges that moving to a different room to interview and process Medicaid applications indicates retaliation by Defendant. Dkt. No. 53, pgs. 7-8. Plaintiff was moved under Bessent's supervision after she complained about working under her previous supervisor. Plaintiff has not shown that her duties were changed as a product of retaliation rather than for the purpose stated by Bryant—to create a specialized Medicaid worker to help improve the SOP. Although employees testified that the business structure in Plaintiff's department is unusual, with only one employee under one supervisor, an unusual business structure created after Plaintiff requested a

27

new supervisor does not, without more, serve as evidence of retaliation. Consequently, this claim fails as a matter of law.

## Changes to September 2011 Performance Evaluation

Plaintiff alleges that Bryant's action of changing the performance review to indicate a lower rating indicates retaliation. Dkt. No. 43, pg. 13. However, Plaintiff has not presented evidence that Bryant, who was notified of numerous complaints regarding Plaintiff, asked Small to redraft the review based on retaliation rather than the reasons presented by Bryant. Bryant testified that she recommended for three of Plaintiff's ratings to be changed from a "3" to a "2" because of complaints that Plaintiff did not return calls, complaints of untimely interviews, and because Plaintiff had untimely and overdue claims. Bryant submitted emails documenting these complaints. Plaintiff presented no evidence to show that Bryant recommended lowering Plaintiff's ratings as a result of retaliation rather than the documented complaints. Consequently, this claim fails as a matter of law.

## Promotional Opportunities

Plaintiff does not satisfy the prima facie case of retaliation with regard to other employees receiving promotions instead of Plaintiff. Plaintiff has not established that she would have been promoted over the other qualified employees but

28

for wrongful actions of the employer. According to Bryant, lead candidates for the acting supervisory position and lead worker positions were determined by each supervisor. Plaintiff has not presented evidence to show that her supervisors exhibited retaliation by choosing other candidates for these promotions. Consequently, Plaintiff has not established a prima facie case of retaliation with regard to promotional opportunities and this claim fails as a matter of law.

Disheveled Office

Plaintiff was away from work on January 22, 2010 through March 10, 2010 for family medical leave. During this time, Plaintiff filed the EEOC Charge of Discrimination, on February 8, 2010. Plaintiff testified that while she was away, her office was put into a state of disarray, unlike how she left the office. Dkt. No. 31, Ex. 10, 112: 6-8. The Court has reviewed the photograph Plaintiff took of her allegedly destroyed office (Dkt. No. 43-1, Ex. 3), and notes that the picture does not represent the scene as described by Plaintiff. Further, the picture shows no indication of who allegedly destroyed her office or when the alleged act took place. Consequently, Plaintiff has failed to establish causation and this claim fails as a matter of law.

AO 72A
(Rev. 8/82)

Christmas Lunches

The alleged instance of retaliation involving Plaintiff not being timely invited to a Christmas lunch and not being given four hours off on December 11, 2012 occurred approximately two years and ten months after Plaintiff filed her EEOC Charge. This event is not in "close temporal proximity" to the filing of the Charge. Consequently, it does not satisfy the prima facie case of retaliation. This claim fails as a matter of law.

III. Additional Claims

Plaintiff alleges a variety of claims in the Complaint and Amended Complaint that she fails to defend in later briefs. Plaintiff alleges that Defendant violated her right to equal protection by demoting Plaintiff rather than Rhodes, a white employee who Plaintiff alleges was responsible for performance deficiencies. Dkt. No. 11, ¶¶ 21, 30-34. Plaintiff also alleges that Defendant's conduct makes Defendant liable for creating a hostile work environment, for intentional infliction of emotional distress, violation of the Thirteenth Amendment, and §§ 1981, 1983, and 1985 claims. Id. at ¶¶ 9-29, 35-38; Dkt. No. 28, ¶ 40. Plaintiff has not mentioned these claims since her Amended Complaints. Even after Defendant argued against the viability of these claims in moving for summary judgment (see Dkt. No. 31-2), Plaintiff did not argue their merits in opposing

30

summary judgment (see Dkt. Nos. 43, 53, 57). According to the Eleventh Circuit, a district court should consider a claim abandoned when a claim included in the complaint is not addressed in opposing summary judgment. Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994)(determining the district court correctly treated as abandoned a claim alleged in the complaint but not raised in support of or in opposition to summary judgment); see also Wilkerson, 270 F.3d at 1322 (deeming claim abandoned where argument was not presented in initial response to summary judgment). "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)(declining to address a legal issue against which a party failed to argue in opposing motion for summary judgment). As Plaintiff similarly failed to present the Court with any argument on the aforementioned claims after the amended complaints, the Court considers these claims abandoned and summary judgment on them appropriate.

31

## CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment, Dkt. No. 31, is **GRANTED** as to the Title VII retaliation, equal protection, hostile work environment, intentional infliction of emotional distress, Thirteenth Amendment, §§ 1981, 1983, and 1985 claims, and **DENIED** as to the Title VII racial discrimination claim.

**SO ORDERED**, this 25TH day of March, 2014.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)